IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MICHAEL RUSSUM,

        Plaintiff,

        v.

OREGON DEPARTMENT OF CORRECTIONS
and STATE OF OREGON; WARREN
ROBERTS; JOSHUA HIGHBERGER; PATRICK
MANEY; DR. REESE; MONICA
LANDAVERDE; WENDY SIEGERSMA;
GARTH GULICK; KRYSTA LYNCH; MORIAM
BALOGUN; JAMIE MILLER; JOE BUGHER;
and JOHN AND JANE DOES,

        Defendants.

Case No. 6:21-cv-00836-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, U.S. Magistrate Judge.**

Plaintiff Michael Russum ("Russum"), an adult in custody ("AIC") currently housed at

Snake River Correctional Institution ("SCRI"), filed this civil rights action against the Oregon

Department of Corrections ("ODOC"), the State of Oregon, Dr. Warren Roberts ("Dr. Roberts"),

Joshua Highberger ("Superintendent Highberger"), Patrick Maney ("Nurse Practitioner Maney"),

Dr. Joshua Reese ("Dr. Reese"), Monica Landaverde ("Nurse Landaverde"), Dr. Wendy

Siegersma ("Dr. Siegersma"), Dr. Garth Gulick ("Dr. Gulick"), Krysta Lynch ("Nurse Lynch"),

Moriam Balogun ("Nurse Practitioner Balogun"), Jamie Miller ("Superintendent Miller"), Joe

PAGE 1 – FINDINGS AND RECOMMENDATION

Bugher ("Bugher"), and John and Jane Does (together, "Defendants"). (First Am. Compl. ("FAC"), ECF No. 35.)

Russum brings this action under 42 U.S.C. § 1983 ("Section 1983") alleging violations of the Eighth Amendment, as well as violations of Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), and a negligence claim. Now before the Court are Defendants' motions for summary judgment. (Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 87; Dr. Roberts' Not. Joinder State Defs.' Mot. Summ. J. ("Dr. Roberts' Mot."), ECF No. 88; Joe Bugher's Not. Joinder State Defs.' Mot. Summ J. ("Bugher's Mot."), ECF No. 72; *see also* Defs.' Reply Supp. Defs.' Mot. Summ. J. ("Defs.' Reply"), ECF No. 78; Def. Joe Bugher's Reply & Joinder State Defs.' Reply, ECF No. 79; Def. Warren Roberts Reply Supp. Joinder Mot. Summ. J. ("Dr. Roberts' Reply"), ECF No. 94.) The Court has jurisdiction over Russum's claims pursuant to 28 U.S.C. §§ 1331 and 1367.

For the reasons that follow, the Court recommends that the district judge grant in part and deny in part Defendants' motions for summary judgment.

## BACKGROUND[1]

Russum experienced steadily worsening hip deterioration while in ODOC custody which he alleges went untreated from 2019 until 2023, causing "excruciating" pain, declining mobility, difficulty with activities of daily living, decompensation, anxiety, and distress.

///

///

///

---

[1] Unless otherwise noted, the following facts are undisputed or presented in the light most favorable to Russum, the non-moving party. The parties submitted Russum's extensive medical records and the Court focuses its factual summary herein on Russum's medical history relating to his hip issues and pain management.

PAGE 2 – FINDINGS AND RECOMMENDATION

I.      **TWO RIVERS CORRECTIONAL INSTITUTION**

Russum began experiencing pain in his left hip in 2019 and communicated his concerns to medical staff at Two Rivers Correctional Institution ("TCRI"). (Decl. Michael Russum ("Russum Decl.") ¶ 2, ECF No. 83.) On October 30, 2019, magnetic resonance imaging ("MRI") of Russum's left hip showed a tear and degeneration at the hip joint. (Russum Decl. ¶ 3; Decl. Michael Seale ("Seale Decl.") Att. 1 at 20, ECF No. 67.[2]) The MRI revealed "[s]ubtle, mild multifocal degenerative changes of the left hip." (Seale Decl. Att. 1 at 20.)

On November 8, 2019, ODOC's Therapeutic Level of Care Committee ("TLC Committee") approved an orthopedic consultation for Russum. (Seale Decl. ¶ 29, Att. 1 at 26.) On November 25, 2019, orthopedist Dr. Richard Carpenter ("Dr. Carpenter") noted that Russum "shows bilateral hip arthropathy" and recommended bilateral hip injections. (*Id.* ¶ 36, Att. 1 at 33.) On December 31, 2019, Russum received steroid injections to his left hip. (*Id.* ¶ 42, Att. 1 at 36-39.) However, Russum's left hip continued to cause "serious" pain. (*Id.* ¶ 45.)

On June 3, 2020, Russum visited Dr. Carpenter, who noted that Russum "is documented to have evidence of a labral tear of his hip, which he would like treatment in the form of either resection or repair" which "would require hip arthroscopy, which I do not do." (*Id.* ¶ 55, Att. 1 at 52, further noting that "[v]ery few general orthopedists do this unless they have been specially trained in hip arthroscopy.")

On June 4, 2020, Dr. Gulick evaluated Russum and requested a second opinion on Russum's hip issues. (*Id.* ¶¶ 56-58, Att. 1 at 45.) On the same date, the TLC Committee denied Dr. Gulick's recommendation that Russum visit a hip specialist and instead recommended three months of physical therapy. (*Id.* ¶ 59, Att. 1 at 55.)

---

[2] Dr. Michael Seale, ODOC's chief medical officer, summarized and attached Russum's ODOC medical records to his declaration.

On October 21, 2020, ODOC's physical therapist noted that Russum was not a good candidate for continued physical therapy and referred Russum back to a physician for a "possible referral to specialist." (*Id.* Att. 1 at 63; Russum Decl. ¶ 6.) Russum began to experience chronic pain in other parts of his body which negatively impacted his mobility, sleep, and daily activities. (Russum Decl. ¶ 7.) His pain was constant, excruciating, and debilitating. (*Id.*) The pain became so severe that Russum could barely walk or stand, could no longer use the stairs, and it became impossible for him to maintain a job. (*Id.* ¶ 8.) He repeatedly reported his pain and worsening condition to his medical providers and requested medical care and pain relief. (*Id.*) His ODOC medical providers prescribed him only anti-inflammatory medications. (*Id.*)

The steroid injections proved unsuccessful and Dr. Carpenter advised that a femoroplasty would be the best treatment plan because physical therapy and steroids were not relieving Russum's pain.[3] (Decl. Abby Greenfield ("Greenfield Decl.") Ex. 8, ECF No. 81; Seale Decl. Att. 1 at 75; Russum Decl. ¶ 6.) On December 8, 2020, the TLC Committee considered Dr. Carpenter's recommendations, noting that Russum had suffered from left hip issues for over two years, and approved a second opinion from Hope Orthopedics. (Seale Decl. ¶ 77, Att. 1 at 73, noting that Drs. Roberts and Gulick were TLC Committee members at the time.)

## II.    OREGON STATE PENITENTIARY

On March 4, 2021, ODOC transferred Russum from TRCI to the Oregon State Penitentiary ("OSP") to obtain a second opinion from Hope Orthopedics. (Greenfield Decl. Exs. 54, 62.) On March 15, 2021, Dr. Robert Fan ("Dr. Fan") at Hope Orthopedics diagnosed Russum with bilateral hip arthritis and recommended surgical intervention. (Seale Decl. Att. 1 at 95;

---

[3] "Femoroplasty is the removal of bony irregularities from and reshaping of the femur." *Joanne G. v. Berryhill*, No. EDCV 18-0997-JPR, 2019 WL 2303833, at *8 (C.D. Cal. May 29, 2019) (citation omitted).

PAGE 4 – FINDINGS AND RECOMMENDATION

Russum Decl. ¶ 21.) Dr. Fan was not certain if a femoroplasty was still possible and recommended additional imaging, including updated x-rays and a computed tomography ("CT") scan of Russum's hips to review surgical intervention options. (Seale Decl. Att. 1 at 95.) Russum received x-rays on March 19, 2021, which showed "focally severe joint space narrowing of the hip joints bilaterally with each femoral head also forming medial osteophytes, more prominently on the left." (*Id.* ¶ 101, Att. 1 at 100; Russum Decl. ¶ 22.)

At OSP, Russum had "accessibility difficulties." (Russum Decl. ¶ 19.) For example, on March 29, 2021, Russum was scheduled to take a legal call at the law library. (Seale Decl. Att. 1 at 104.) A correctional officer told Russum that OSP did not have to comply with the ADA due to its age and that Russum had to walk to the call or miss it. (*Id.*) Russum struggled up and down the stairs because his hips were in severe pain and his lower-mid back muscles began to spasm. (*Id.*) On April 7, 2021, Russum sent an AIC communication form asking if "there is any [] way to access the law library without climbing the stairs?" (Greenfield Decl. Ex. 38.) ODOC responded that there is "no way to access the law library without climbing stairs." (*Id.*)

Russum also sent an AIC communication form asking if there were any "Christian church services . . . not in the chapel on the [fourth] floor?" (*Id.* Ex. 37.) The chaplain responded that "we have no way of providing church services downstairs" and that Russum "may want to consider transferring to an institution that has no stairs (like [Oregon State Correctional Institution ("OSCI")]." (*Id.*) Russum also could not obtain clothes because the ramp to the clothing exchange was too steep and he had difficulty accessing a phone. (Russum Decl. ¶ 16.) Russum requested accommodations for the medication line because it required him to stand, sometimes for long periods of time, and the pain was so excruciating that he was completely immobilized at times. (*Id.* ¶ 17.)

PAGE 5 – FINDINGS AND RECOMMENDATION

Joshua Lawson ("Lawson") was the Grievance, Discrimination, and ADA Coordinator at OSP at the time. (Decl. Joshua Lawson ("Lawson Decl.") ¶ 2, ECF No. 85.) Lawson states that "[OSP] was built long before Civil Rights laws and specifically ADA law came into existence" and much of the "facility is not accessible to individuals in wheelchairs, walkers, or with mobility issues." (*Id*.) Nevertheless, Lawson stated that OSP provides reasonable accommodation and modifications to AICs. (*Id*.) Lawson explained that these "modifications to programming and services are customized to fit each individual and their needs and circumstances within the recommendations provided though Health and Behavioral Services [and] AICs also have access to the internal Grievance and Accessibility programs within each [ODOC] facility." (*Id*. ¶ 3.)

According to Lawson, "[i]f an AIC with mobility issues wishes to access the law library, upon specific request (kyte submission), service would be provided." (*Id*. ¶ 8.) Lawson asserts that every kyte Russum sent to request assistance with legal materials was fulfilled. (*Id*. ¶ 10.) Lawson also states that if an AIC with mobility issues wishes to access religious services, it is the usual practice for chaplains to be available in the "common" areas and religious literature is routinely provided to AICs. (*Id*. ¶ 9.) Furthermore, the clothing exchange and shower area has a ramp that meets ADA accessibility requirements to include handrails. (*Id*. ¶ 12.)

On March 18, 2021, Russum's medical provider entered a six-month bottom bunk and no-stair restriction and approved an elevator pass. (Seale Decl. ¶ 102, Att. 1 at 101.) On April 5 and May 18, 2021, Kelly Carlson, the legal library coordinator, reached out to other prison staff about how to ensure that Russum could gain access to a computer to access his legal work and various prison officials inquired about transferring Russum to OSCI. (Greenfield Decl. Ex. 30.)

///

PAGE 6 – FINDINGS AND RECOMMENDATION

On April 13, 2021, the TLC Committee approved a 3D CT scan of Russum's hips. (Seale Decl. ¶ 107, Att. 1 at 106; Russum Decl. ¶ 23.)

## III.    OREGON STATE CORRECTIONAL INSTITUTION

ODOC transferred Russum to OSCI in late May 2021. (Greenfield Decl. Ex. 54.) Upon arrival, Russum sent a kyte to the security captain requesting an accommodation to shower with a stool because he experienced pain while standing and felt particularly unsteady in the shower. (Russum Decl. ¶ 25.) Russum's request was denied and OSCI provided no alternative options. (*Id*. ¶ 26.) Russum was also housed in a unit located furthest from the chow hall, making it difficult and painful to go to mealtimes. (*Id*. ¶ 27.)

Russum wrote to OSCI ADA Coordinator R. Corrigan ("ADA Coordinator Corrigan") to express his concern that his limited mobility prevented him from accessing the phones in the prison yard. (*Id*. ¶ 28; *see also* Greenfield Decl. Ex. 52.) For phone calls inside the unit, Russum was limited to ten minutes, whereas phone calls on the yard did not have a time restriction but there were no places to sit during a call. (Russum Decl. ¶ 29.) On August 7, 2021, Russum wrote to ADA Coordinator Corrigan requesting to use a lift to access the phones on the yard, but Corrigan responded that the lift is for the multi-room and there is a ramp for the yard. (Greenfield Decl. Ex. 49.)

Throughout his stay at OSCI, Russum wrote to medical staff about his unrelieved pain, including Nurse Practitioner Balogun, Nurse Lynch, and Superintendent Highberger. (Russum Decl. ¶ 30.) On June 16, 2021, Russum had a provider appointment with Nurse Practitioner Balogun. (Seale Decl. ¶ 122, Att. 1 at 120.) At the appointment, Nurse Practitioner Balogun followed up on Russum's chronic bilateral hip pain and Russum reported that prolonged standing, stairs, and climbing into bed aggravated his pain. (*Id*.)

///

PAGE 7 – FINDINGS AND RECOMMENDATION

On July 8, 2021, Russum communicated with Superintendent Highberger and described his difficulties in obtaining accommodations. (Russum Decl. ¶ 30.) Russum expressed his concerns with access to phones, fear of falling in the shower, and his need for a wheelchair and assistance. (Greenfield Decl. Ex. 31.)

On August 11, 2021, ODOC referred Russum to Hope Orthopedics for bilateral hip pain and a CT scan of both hips. (Seale Decl. ¶ 126, Att. 1 at 124-25.) On the same day, the TLC Committee acknowledged that Dr. Fan recommended hip arthroscopy, but approved only further physical therapy. (*Id.* ¶ 128, Att. 1 at 128.) In September 2021, Russum visited Dr. Roberts regarding his neck pain and the TLC Committee approved physical therapy for Russum's neck pain which Russum received in September and October 2021. (*Id.* ¶¶ 130-31, 134-35, 137.)

Russum did not visit with a Hope Orthopedics provider until December 2, 2021. (Russum Decl. ¶ 31.) At that appointment, a provider informed Russum that a femoroplasty was no longer viable and that Russum would need a full hip replacement. (Seale Decl. ¶ 140, Att. 1 at 140; Russum Decl. ¶ 31.) The provider also told Russum that his hip condition had severely worsened and exacerbated Russum's chronic leg and neck pain. (*Id.*) On December 9, 2021, Russum sent an AIC communication stating he was "in horrible pain" and needed to discuss pain management and additional physical restrictions. (Seale Decl. ¶ 141, Att. 1 at 141.)

## IV.    SNAKE RIVER CORRECTIONAL INSTITUTION

On December 15, 2021, ODOC transferred Russum to SRCI. (Greenfield Decl. Ex. 54.) While attempting to get into the transport van, Russum could not climb the steps. (Russum Decl. ¶ 32.) Russum told the transport staff that he had a stair restriction and had extreme difficulty climbing steps but the correctional officer shoved and pushed him up the steps to get him into the van. (*Id.*) When Russum transferred from the van to subsequent buses, the same thing happened

PAGE 8 – FINDINGS AND RECOMMENDATION

two additional times. (*Id*.) For the entire eight-hour trip from OSCI to SRCI, Russum was experiencing excruciating pain. (*Id*.)

Once Russum arrived at SRCI, he repeatedly told his medical provider, Dr. Gulick, and various medical staff at SCRI, including Dr. Siegersma and Nurse Landaverde, that his pain had become so severe that it was not manageable. (*Id*. ¶ 33.) Russum became almost entirely immobile and the pain was so severe and constant that he could not sleep, exercise, or engage in leisure activities. (*Id*.) On December 29, 2021, the TLC Committee approved an orthopedic consultation. (Seale Decl. ¶ 148, Att. 1 at 148.)

On January 4, 2022, Russum had an appointment with Dr. Gulick, who noted that Russum was a candidate for bilateral hip replacement. (*Id*. ¶ 152, Att. 1 at 152-53.) Dr. Gulick wrote an order for a full-time wheelchair for four months, pulmonary function testing, labs, physical therapy, and prescriptions for meloxicam and nortriptyline. (*Id*.) Russum's condition did not improve. (Greenfield Decl. Ex. 22.) The medications that Dr. Gulick prescribed were ineffective in treating Russum's pain and Russum repeatedly requested additional pain management. (*Id*.; *see also id.* Ex. 21; Russum Decl. ¶ 33.)

On March 25, 2022, Russum noted that he was not noticing any improvement in his hip pain. (Seale Decl. ¶ 169, Att. 1 at 173.) On June 30, 2022, Russum had an appointment with Dr. John Foote ("Dr. Foote"), an orthopedic surgeon, who agreed that Russum would have been a good candidate for a femoroplasty back when it was first recommended, but that the delays in treatment caused too much damage and made him ineligible and therefore Russum would need to replace both hips. (Russum Decl. ¶ 38.) On July 27, 2022, Russum visited Dr. Siegersma regarding the orthopedic consult and Dr. Siegersma noted that Russum needed to lose thirty pounds before having surgery. (*Id.* ¶ 41; Seale Decl. ¶ 191, Att. 1 at 206.) Russum requested

PAGE 9 – FINDINGS AND RECOMMENDATION

medical assistance to lose weight but was denied any assistance. (Russum Decl. ¶ 41.) In August 2022, the TLC Committee approved Russum's total hip replacement surgery. (Seale Decl. ¶¶ 192-93, Att. 1 at 207-08.)

On January 15, 2023, Russum sent an AIC communication noting that his pain had intensified and that he needed something "ASAP" to get by until his surgery. (*Id.* ¶ 212, Att. 1 at 232.) On April 25, 2023, Russum had a telehealth evaluation with a pain specialist. (*Id.* ¶ 235.) Russum did not receive any pain medications prior to surgery aside from anti-inflammatory and anti-depressant medications, which did not relieve his pain. (Russum Decl. ¶ 40.)

On April 28, 2023, Russum underwent a total hip replacement of his left hip and on June 14, 2023, a total hip replacement of his right hip. (*Id.* ¶ 42.) On October 11, 2023, Russum had a postoperative orthopedic appointment, at which Dr. Foote noted that Russum was doing well and his wounds had healed nicely. (Seale Decl. ¶ 266, Att. 1 at 326-28.)

Even though his pain and mobility have improved, Russum still has extreme surges of pain at times and lingering mobility difficulties. (Russum Decl. ¶ 42.) During the period of time from 2019-2023 when his hip pain was worsening and he could not access medical care or accommodations, Russum experienced "such decompensation both physically and mentally that [he] increasing[ly] felt like giving up and had suicidal ideation" because he "saw no end in sight[.]" (*Id.* ¶ 47.)

## V.    MEDICAL EXPERT OPINIONS

The parties filed competing expert opinions regarding the adequacy of Russum's medical care.

Defendants' medical expert, Dr. Mark Manoso, is a civilian orthopedic surgeon in private practice. (Decl. Mark Manoso ("Manoso Decl.") ¶ 4, ECF No. 68.) He reviewed Russum's medical records and amended complaint and opined that based on the radiographic reports,

PAGE 10 – FINDINGS AND RECOMMENDATION

"arthroscopic femoral neck ostectomy and labral repair would not have been good options for [Russum] given the end stage nature of his arthritis that progressed rapidly" and "would have had a higher failure rate" because of Russum's "morbid obesity[.]" (*Id.* ¶ 43.) Dr. Manoso also concluded that the "timing for diagnostic evaluation and subsequent surgery . . . does not appear to have been excessive" and that "[i]ndividuals go years with progressive pain in their hips prior to having hip replacement." (*Id.* ¶ 44.) In summary, Dr. Manoso concluded that ODOC "operated within the community standard of care for Mr. Russum's medical management and ancillary mobility needs with adjustments to his incarceration location to allow wheelchair usage." (*Id.* ¶ 47.)

In response, Russum submitted the declaration of Dr. Mark Baskerville ("Dr. Baskerville"), a "quintuple board-certified physician in the clinical specialties of critical care, emergency medicine, anesthesiology, addiction medicine, and neurocritical care." (Decl. Dr. Mark Baskerville ("Baskerville Decl."), ECF No. 93.) Dr. Baskerville reviewed Russum's medical and case records and conducted more than four hours of medical interviews with Russum. (*Id.* ¶¶ 5-6.) Dr. Baskerville stated that "it is my opinion that the ODOC medical providers failed to evaluate, treat, monitor, refer, and/or facilitate the medically indicated care for" hip autoscopies and chronic pain syndromes. (*Id.* ¶¶ 12-46.) Dr. Baskerville concluded that "[a]s a consequence of ODOC's continuing failure to provide prompt and adequate medical care, Mr. Russum suffered needlessly from potentially reversible complex pain syndromes and disabling bilateral hip arthropathies" and "[h]is ODOC medical record was replete with improper evaluations, inadequate treatment, and prolonged delays in care—including specialist consultation." (*Id.* ¶ 47.)

///

PAGE 11 – FINDINGS AND RECOMMENDATION

## VI.    PROCEDURAL HISTORY

Russum filed this action on June 1, 2021, alleging First, Eighth, and Fourteenth Amendment claims against former Governor Kate Brown and several ODOC officials (Colette Peters, Kevin Jackson, Tyler Blewett, B. Kelly, and Rob Persson). (Compl. at 4, ECF No. 2.) Russum alleged that "he was not protected from COVID[,]" his mental health issues were being inadequately treated, his medical issues were not being addressed in a timely manner, and he did not have adequate "access to the law library, religious services, [and] clothing." (*Id.* at 4-5.)

Russum filed an amended complaint on June 12, 2023, adding claims for violations of the ADA, the Rehabilitation Act, and negligence against Defendants. (*See* FAC.) Russum based his new claims on Defendants' alleged failure to "properly diagnose or treat his hip condition, causing the condition to steadily worsen and eventually necessitating a full hip replacement." (*Id.* ¶ 3.) In the FAC, Russum did not include any of the defendants from his original complaint and did not include any claims relating to the COVID-19 pandemic.[4] (*Id*. at 1.) Russum seeks economic and noneconomic damages, punitive damages, declaratory relief, and injunctive relief. (FAC at 22-23.)

## LEGAL STANDARDS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary

---

[4] In *Maney v. State of Oregon et al.*, the Court certified a class action of "all adults incarcerated in [ODOC] facilities who: (1) were incarcerated on or after February 1, 2020; (2) while incarcerated, tested positive or were otherwise diagnosed with COVID-19; and (3) if they became incarcerated after February 1, 2020, tested positive or were otherwise diagnosed with COVID-19 at least [fourteen] days after they entered ODOC custody." (*Maney v. State of Oregon et al.*, No. 6:20-cv-00570-SB, Op. & Order at 9-10, 53-54, ECF No. 377.) Russum did not opt out of the class action. (*See Maney*, Decl. Nadia Dahab Supp. Pls.' Status Report Regarding Class Notice, Ex. A, ECF No. 421-1, listing class members who timely opted out of the class action). The *Maney* class action remains pending.

PAGE 12 – FINDINGS AND RECOMMENDATION

judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, a court views the evidence in the light most favorable to, and draws all justifiable inferences in favor of, the nonmoving party. *See McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706 (9th Cir. 2019) (per curiam) ("The court views 'evidence in the light most favorable to the nonmoving party,' to determine 'whether genuine issues of material fact exist.'" (quoting *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014))); *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) ("When determining whether a genuine issue of material fact exists, [a court] 'must draw all justifiable inferences in favor of the nonmoving party.'" (quoting *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1189 (9th Cir. 2021))). In doing so, a "court . . . may not judge credibility, weigh the evidence, or resolve factual disputes[.]" *Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 437 (9th Cir. 2023) (citing *Anderson*, 477 U.S. at 255).

## DISCUSSION

## I.     STATUTE OF LIMITATIONS

Defendants move for summary judgment on all of Russum's claims to the extent they are based on conduct prior to June 12, 2021 (i.e., two years before Russum filed the FAC) on the ground that the applicable two-year statute of limitations bars his claims. (Defs.' Mot. at 12.)

PAGE 13 – FINDINGS AND RECOMMENDATION

A.    **Applicable Law**

"Section 1983 contains no specific statute of limitations, and therefore federal courts apply the forum state's statute of limitations for personal injury actions." *Johnson v. Spivey*, No. 3:16-cv-00620-SB, 2018 WL 3468482, at *9 (D. Or. July 18, 2018) (citing *Maldonado v. Harris*, 370 F.3d 945, 954-55 (9th Cir. 2004)). In Oregon, the applicable statute of limitations for a Section 1983 action is two years from the date on which the cause of action accrues. *See Sain v. City of Bend*, 309 F.3d 1134, 1139 (9th Cir. 2002); *see also* OR. REV. STAT. § 12.110(1) ("An action . . . for any injury to the person or rights of another, not arising on contract, and not especially enumerated in this chapter, shall be commenced within two years[.]").

B.    **Analysis**

The parties agree that a two-year statute of limitations applies to Russum's claims. (Defs.' Mot. at 12, "In Oregon, the two-year statute of limitations for negligence actions, OR. REV. STAT. § 12.110(4) applies to civil rights actions under Section 1983, as well as actions under Americans with Disabilities Act Title II: 42 U.S.C. §12131 and § 504 of the Rehabilitation Act of 1973."; Pl.'s Resp. Defs.' Mot. Summ. J. ("Pl.'s Resp.") at 10, ECF No. 90, "Plaintiff does not dispute that a two-year statute of limitations applies to each of Plaintiff's claims.") The Court agrees.[5] Although the parties agree on the applicable statute of limitations, they disagree on the date the statute of limitations began to accrue.

---

[5] *See Evans v. Nelson*, No. 2:19-cv-01210-MK, 2022 WL 20335877, at *10 (D. Or. Sept. 7, 2022) (granting summary judgment on the plaintiff's Eighth Amendment claim based on the "two-year statute of limitations"); *Duncan v. Eugene Sch. Dist. 4J*, 431 F. Supp. 3d 1193, 1202 (D. Or. 2020) (holding that "Section 504 and the ADA do not include a specific statute of limitations" and that "[t]he District of Oregon has generally held that for non-employment claims brought under the Rehabilitation Act or the ADA, the most analogous Oregon statute is [OR. REV. STAT.] § 12.110, which provides a two-year statute of limitations") (citations omitted); *Torch v. Windsor Surry Co.*, No. 3:17-cv-00918-AA, 2019 WL 6709379, at *7 (D. Or. Dec. 9, 2019) (holding that "the statute of limitations for negligence actions is two years") (citation omitted).

PAGE 14 – FINDINGS AND RECOMMENDATION

### 1.    Relation Back

Russum's claims relating to his incarceration at TRCI and OSP accrued more than two years before he filed his amended complaint, but Russum argues that those claims "plainly relate back to the original complaint" because the FAC "amplifies . . . claims and identifies additional defendants involved in the same conduct, transactions, and occurrences in custody." (Pl.'s Resp. at 10.) Defendants argue that Russum's FAC does not relate back to the original complaint because the original complaint was "against a completely different set of defendants" and "was about conditions of confinement and problems stemming from the COVID lockdown." (Defs.' Reply at 2.) Defendants also argue that Russum's "original complaint did not allege claims relating to treatment of his hips or chronic pain" and "did not allege that ODOC denied [Russum] access to the law library, religious services, or clothing." (*Id.*)

Under Federal Rule of Civil Procedure ("Rule") 15(c)(1), "[a]n amendment to a pleading relates back to the date of the original pleading when: (A) the law that provides the applicable statute of limitations allows relation back; (B) the amendment asserts a claim [] that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." FED. R. CIV. P. 15(c)(1); *see also ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) ("To relate back, the original and amended pleadings must share a common core of operative facts so that the adverse party has fair notice of the transaction, occurrence, or conduct called into question.") (simplified). "The

PAGE 15 – FINDINGS AND RECOMMENDATION

relation back doctrine [of Rule 15(c)] is to be liberally applied." *Id.* (citation omitted). Russum

bears the burden of establishing that his FAC claims relate back to the claims in his original

complaint. *See Wilkins-Jones v. County of Alameda*, No. C-08-1485 EMC, 2012 WL 3116025, at

*14 (N.D. Cal. July 31, 2012) (noting that "it is [the p]laintiff's burden to show relation back").

The Court finds that the ADA and Rehabilitation Act claims in Russum's FAC relate

back to the claims in his original complaint. In Claim III of his original complaint, Russum

clearly complained about his limited access to "the law library, religious services, [and]

clothing" due to his medical issues. (Compl. at 5.) Although he did not name ODOC or the State

of Oregon as defendants in his original complaint, Defendants do not argue that ODOC or the

State of Oregon lacked fair notice of the claims in Russum's original complaint. The Court

concludes that Russum's ADA and Rehabilitation Act claims arise out of "a common core of

operative facts" as those in his original complaint and are not time-barred.

The Court need not decide if the Eighth Amendment and negligence claims in Russum's

FAC relate back to his original complaint because those claims may proceed based on the

discovery rule.

### 2.    The Discovery Rule

Russum seeks to avoid the two-year statute of limitations through the discovery rule,

arguing that the statute of limitations did not begin to run until he had knowledge of his injury

and its cause. (Pl.'s Resp. at 11.)

In *Chudy*, the Ninth Circuit reversed the district court's dismissal of a Section 1983

deliberate indifference claim as time barred. *See Johnson v. Chudy*, 822 F. App'x 637, 638 (9th

Cir. 2020). The plaintiff "was diagnosed with prostate cancer in 2013 and filed th[e] action in

2014." *Id.* "The district court dismissed [the plaintiff's] claim as barred by California's four-year

statute of limitations, finding the claim accrued in 2009 when [the plaintiff] sought medical care

PAGE 16 – FINDINGS AND RECOMMENDATION

and was aware that his symptoms were not treated." *Id.* The Ninth Circuit concluded that "the injury that is the basis of [the plaintiff's] claim [wa]s his development of advanced cancer as the alleged result of the defendant's failure to treat him, not the symptoms and pain the defendant allegedly failed to treat in 2009." *Id.* at 639.

As in *Chudy*, Russum does not allege that he was unaware of the "symptoms and pain that [D]efendant[s] allegedly failed to treat[.]" *Chudy*, 822 F. App'x at 638. He clearly alleges suffering hip pain for years. Nevertheless, Russum was not aware of the injury that underlies his claims until Russum "saw orthopedic surgeon Dr. Foote . . . [o]n or about June 30, 2022, . . . [who told him] that he would have benefitted from femoroplasty and labral tear repair back when it was first recommended, but that because of the delay in care, [Russum] now required a full hip replacement on both sides." (Russum Decl. ¶ 62.) Defendants' alleged failure timely to treat Russum's hip issues and loss of less invasive treatment options as a result is the core of Russum's Eight Amendment claims. (*See* FAC ¶ 3, "ODOC did not properly diagnose or treat [Russum's] hip condition, causing the condition to steadily worsen and eventually necessitating a full hip replacement"). Accordingly, Russum "had no reason to connect" his need for a total hip replacement to Defendants' failure to provide adequate care until June 30, 2022, which is the date on which his Eighth Amendment claims relating to his hip issues began to accrue. *See Chudy*, 822 F. App'x at 639; *see also Johnson v. Naku*, No. 215CV01313TLNKJN, 2021 WL 53109, at *4 (E.D. Cal. Jan. 6, 2021) ("[T]he Court adopts the discovery rule as applied by the Ninth Circuit in *Chudy* to determine the accrual date of Plaintiff's claims against [the defendant]. To the extent Plaintiff claims [the defendant]'s deliberate indifference resulted in Plaintiff developing cancer and obtaining a late diagnosis, Plaintiff's claim accrued on July 16, 2013, when Plaintiff was diagnosed with prostate cancer." (first citing *Chudy*, 822 F. App'x at 638-39;

PAGE 17 – FINDINGS AND RECOMMENDATION

then citing *Gregg v. Haw. Dep't of Public Safety*, 870 F.3d 883, 885 (9th Cir. 2017); and then

citing *Bibeau v. Pac. Nw. Research Found. Inc.*, 188 F.3d 1105, 1108 (9th Cir. 1999), *opinion*

*amended on denial of reh'g*, 208 F.3d 831 (9th Cir. 2000))); *see also Gregg*, 870 F.3d at 885

(reversing the district court's dismissal of the plaintiff's Eighth Amendment claim as time barred

where she alleged she was unaware of the injuries caused by therapy while in custody until after

she stopped participating in the therapy sessions); *Bibeau*, 188 F.3d at 1108 (applying discovery

rule to Eighth Amendment claims involving testicular irradiation experiments at OSP, brought

years after the experiments ended).

For these reasons, the Court finds that the discovery rule tolls the two-year statute of

limitations for Russum's Eighth Amendment claim, the limitations clock did not start until June

30, 2022, and therefore Russum timely asserted his Eighth Amendment claims.[6]

## II.    ELEVENTH AMENDMENT

Defendants move for summary judgment on the ground that Russum's "claims should be

barred under the Eleventh Amendment to the extent it is against State Defendants in their official

capacity." (Defs.' Mot. at 13.) Russum responds that his ADA and Rehabilitation Act claims are

properly before the Court and not barred by the Eleventh Amendment. (Pl.'s Resp. at 13.)

Specifically, Russum alleges that Oregon waived sovereign immunity for claims under the ADA

---

[6] Russum also argues "that the approximately two-year period between the filing of the original and amended complaints is partially attributed to a stay of litigation related to resolution of [the] class certification question in a related case and a second stay intended to pause the case until completion of [Russum]'s hip surgeries, to prevent unnecessary premature filings." (Pl.'s Resp. at 11.) The stay resulting from class certification in the related class action did not prevent Russum from filing a new complaint asserting the claims he eventually included in his FAC (or moving to lift the stay of this case to allege new claims). Further, the Court did not stay this case pending the completion of Russum's hip surgeries but rather granted the parties' several motions for extensions of time to file and answer the amended complaint. (*See* ECF Nos. 21, 28-29, 31-34, 36, 41.)

and Rehabilitation Act. (*Id*.) Russum "takes no position on the Eleventh Amendment['s]

applicability to [Russum's] state-law negligence claim." (*Id*.)

A.      **ADA and Rehabilitation Act Claims**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall

not be construed to extend to any suit in law or equity, commenced or prosecuted against one of

the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

U.S. Const. amend. XI. Although the text of the Eleventh Amendment preserves a state's

sovereign immunity only when it faces suits by citizens of a different state, the Supreme Court

has "extended the Amendment's applicability to suits by citizens against their own States." *Bd.*

*of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) (citations omitted); *see also Holz v.*

*Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1180 (9th Cir. 2003) (noting that the Eleventh

Amendment also applies to "certain actions against state agencies and state instrumentalities")

(simplified).

Plaintiffs may overcome the Eleventh Amendment bar if Congress abrogates a state's

sovereign immunity. *See Garrett*, 531 U.S. at 364 ("Congress may subject nonconsenting States

to suit in federal court when it does so pursuant to a valid exercise of its [Section] 5 power."

(citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976))). Congress abrogates a state's sovereign

immunity if it (1) "makes its intention to abrogate unmistakably clear in the language of the

statute" and (2) "acts pursuant to a valid exercise of its power under [Section] 5 of the Fourteenth

Amendment." *Nev. Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003) (citations omitted).

In 1999, the Ninth Circuit held that Title II of the ADA meets both requirements. *See Dare v.*

*California*, 191 F.3d 1167, 1175 (9th Cir. 1999) (holding that Title II abrogated state sovereign

immunity because it "was a congruent and proportional exercise of Congress'[] enforcement

powers under [Section] 5 of the Fourteenth Amendment").

PAGE 19 – FINDINGS AND RECOMMENDATION

After *Dare*, the Supreme Court held that the Eleventh Amendment bars claims under Title I of the ADA, but "left open . . . the question whether the Eleventh Amendment permits suits for money damages under Title II." *Tennessee v. Lane*, 541 U.S. 509, 514 (2004) (citing *Garrett*, 531 U.S. at 360 n.1). In *Lane*, the Supreme Court held that Title II abrogated state sovereign immunity but limited its holding to cases implicating the fundamental right of access to the courts. *See id.* at 531 ("Because we find that Title II unquestionably is valid [Section] 5 legislation as it applies to the class of cases implicating the accessibility of judicial services, we need go no further.") (citation omitted). The Supreme Court later extended *Lane*'s holding to all Title II claims that are based on conduct that violates the Fourteenth Amendment. *See United States v. Georgia*, 546 U.S. 151, 159 (2006) ("[I]nsofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity.").

"*Georgia* set forth a three-part test to determine whether a Title II claim may proceed against a nonconsenting state: (1) does a state's alleged conduct violate Title II; (2) does the state's alleged conduct also violate the Fourteenth Amendment; and (3) is Congress' abrogation of sovereign immunity valid even if the state's alleged conduct does not violate the Fourteenth Amendment." *Olson v. Allen*, No. 3:18-cv-001208-SB, 2019 WL 1232834, at *2 (D. Or. Mar. 15, 2019) (citing *Georgia*, 546 U.S. at 159).

In *Phiffer v. Columbia River Corr. Inst.*, 384 F.3d 791 (9th Cir. 2004), the State of Oregon appealed the district court's denial of its motion for judgment on the pleadings on the plaintiff's Title II claim based on Eleventh Amendment immunity, arguing that *Garrett* overruled prior circuit precedent. The Ninth Circuit disagreed. *See id.* at 793. The Supreme Court granted certiorari, vacated the panel decision, and remanded for further consideration in light of

PAGE 20 – FINDINGS AND RECOMMENDATION

*Lane*. *See id.* at 792. On remand, the *Phiffer* court concluded that its "initial resolution of th[e] case is consistent with *Lane*'s holding[.]" *Id.* Following *Lane* and *Georgia*, the Ninth Circuit continues to reaffirm its decision in *Phiffer* that "Title II abrogates a state's Eleventh Amendment immunity." *Okwu v. McKim,* 682 F.3d 841, 845 (9th Cir. 2012) (citing, *inter alia*, *Phiffer*, 384 F.3d at 792); *see also Daniel v. Levin,* 172 F. App'x 147, 149 (9th Cir. 2006) (holding that "the Eleventh Amendment does not bar ADA or [Rehabilitation Act] suits against state officials in their official capacities for injunctive relief or damages" (citing *Phiffer*, 384 F.3d at 791-92)); *see also Bonneau v. Dep't of Motor Vehicles*, No. 3:26-cv-00878-AN, 2026 WL 1195007, at *3 (D. Or. May 1, 2026) ("[C]laims brought under Title II of the ADA are not barred by Eleventh Amendment immunity." (first citing *Georgia*, 546 U.S. at 159; and then citing *Lovell v. Chandler*, 303 F.3d 1039, 1051 (9th Cir. 2002))).

Consistent with Ninth Circuit authority, the Court finds that Title II of the ADA and Section 504 of the Rehabilitation Act abrogate Oregon's Eleventh Amendment immunity and recommends that the district judge deny Defendants' motion for summary judgment on this ground.

### B.    Negligence Claim

Defendants argue that Russum's negligence claim against ODOC must "fail under the Eleventh Amendment." (Defs.' Mot. at 14.) Russum "takes no position on the Eleventh Amendment['s] applicability to [Russum's] state-law negligence claim." (Pl.'s Resp. at 13.)

The Court agrees that the Eleventh Amendment bars Russum's state law negligence claim against ODOC. *See Littell v. State by & through Or. Dep't of Corr.*, No. 2:23-cv-01084-MTK, 2025 WL 2379734, at *4 (D. Or. Aug. 15, 2025) ("ODOC is immune from suit in federal court on Plaintiff's negligence claim."); *Parkerson v. ODOC*, No. 2:23-cv-01865-HZ, 2025 WL 2320472, at *4 (D. Or. Aug. 12, 2025) ("Because ODOC is immune from suit in tort in this

PAGE 21 – FINDINGS AND RECOMMENDATION

Court under the Eleventh Amendment, Plaintiff's claims against it must be dismissed.")

(citations omitted); *Eaton v. Two Rivers Corr. Inst.*, No. 2:20-cv-01251-SI, 2020 WL 7364975,

at *4-5 (D. Or. Dec. 15, 2020) (holding that "[t]he State of Oregon has not consented to suit in

federal court or otherwise waived its immunity as is relevant to [the plaintiff's state law] claims"

and the plaintiffs "cannot bring state law claims against employees of the State of Oregon for

actions that the ODOC employees took in the course or scope of their employment in this

Court"). Accordingly, the Court recommends that the district judge grant Defendants' motion for

summary judgment on Russum's negligence claim against ODOC.

## III.    ADA AND REHABILITATION ACT

Defendants move for summary judgment on Russum's ADA and Rehabilitation Act

claims on the grounds that Russum failed to exhaust available administrative remedies and for

failure to state a claim. (Defs.' Mot. at 15-18.)

### A.    Failure to Exhaust

Defendants move for summary judgment on the ground that Russum "failed to exhaust

all of his administrative remedies . . . which is required by the Prison Litigation Reform Act

('PLRA')." (Defs.' Mot. at 15.) Specifically, Defendants argue that although Russum "noted that

he sent letters to the superintendent and the ADA coordinator, he did not file a grievance to

remedy his claim." (*Id*.) Russum responds that he "diligently filed grievances when the process

was available to him, but where he was unable, he is excused from the requirement because the

administrative remedy was effectively unavailable." (Pl.'s Resp. at 13.)

#### 1.    Applicable Law

The PLRA requires AICs "to exhaust available administrative remedies prior to filing a

[Section] 1983 lawsuit challenging prison conditions." *Draper v. Rosario*, 836 F.3d 1072, 1078

(9th Cir. 2016) (citations omitted). "Proper exhaustion demands compliance with an agency's

PAGE 22 – FINDINGS AND RECOMMENDATION

deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). To overcome the exhaustion requirement,

> [t]he Supreme Court has identified three examples of circumstances in which administrative remedies are effectively unavailable: (1) when the grievance system "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the system is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Eaton v. Blewett*, 50 F.4th 1240, 1245 (9th Cir. 2022) (quoting *Ross v. Blake*, 578 U.S. 632, 642 (2016)). The Ninth Circuit has also "found administrative remedies effectively unavailable in several [additional] circumstances." *Id.* (citing *Andres v. Marshall*, 867 F.3d 1076, 1078 (9th Cir. 2017)). For example, in *Nunez*, the Ninth Circuit held that a "failure to timely exhaust . . . administrative remedies is excused because [an AIC] took reasonable and appropriate steps to exhaust his . . . claim and was precluded from exhausting, not through his own fault but by the Warden's mistake." *Nunez v. Duncan*, 591 F.3d 1217, 1224 (9th Cir. 2010). A failure to exhaust is also excused where AICs "were unable to access information about the administrative grievance process . . . or the form necessary to submit a grievance[.]" *Eaton*, 50 F.4th at 1245 (simplified) (first citing *Albino v. Baca*, 747 F.3d at 1172; and then citing *Marella v. Terhune*, 568 F.3d 1024, 1026 (9th Cir. 2009)).

The Ninth Circuit has held that the defendant bears the burden of proving that an administrative remedy was available to the AIC and the AIC failed to exhaust such remedy, because non-exhaustion is an affirmative defense. *See Albino*, 747 F.3d at 1172. "Once the defendant has carried that burden, the [AIC] has the burden of production." *Id.* "That is, the burden shifts to the [AIC] to come forward with evidence showing that there is something in his

PAGE 23 – FINDINGS AND RECOMMENDATION

particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.*

### 2.    Analysis

Defendants argue that Russum did not file any grievances relating to ADA accommodations during his stays at OSP or OSCI. (Defs.' Mot. at 15.) In response, Russum alleges that "after he arrived at OSCI, he had already been told that ADA issues were not 'grievable[.]'" (Russum Decl. ¶ 19.) Specifically, Russum asked a correctional officer "what to do about the accessibility difficulties and he told me that because of the age of OSP, the building was exempt from the requirements of the ADA." (*Id.*) Accordingly, Russum asserts that he had no reason to believe that he then needed to grieve ADA issues and he "would have no reason to question this information that was provided by a security staff member who, presumably, had access to accurate information and had at least some authority on the subject." (Pl.'s Resp. at 14.) In addition, Russum cites evidence that he wrote to OSCI's ADA coordinator several times to report his accessibility issues. (*Id.* at 6, citing Greenfield Decl. Exs. 47-50 & Russum Decl. ¶ 29.) Defendants do not specifically address the availability of ODOC's grievance process to Russum. (*See generally* Defs.' Mot. at 14-15; Defs.' Reply.)

Defendants do not dispute that an OSP correctional officer informed Russum that he was not allowed to grieve ADA issues. (*See* Seale Decl. Att. 1 at 104; Russum Decl. ¶ 19.) In light of this representation, the Court finds that ODOC's grievance procedures were effectively unavailable to Russum to grieve accessibility issues and therefore he was not required to exhaust those procedures.[7] *See Munoz v. United States*, 28 F.4th 973, 975 (9th Cir. 2022) ("[W]hen a

---

[7] In addition, the record reflects that Russum sent numerous communications to officials at each institution regarding his accessibility issues and Defendants do not address his argument that these communications satisfied the exhaustion requirement. *See, e.g.*, *Albino*, 747 F.3d at 1175-76 (holding that the grievance process was unavailable where the plaintiff "repeatedly

PAGE 24 – FINDINGS AND RECOMMENDATION

prison's administrative grievance system is 'so opaque that it becomes, practically speaking, incapable of use' because 'no ordinary prisoner can discern or navigate it,' administrative remedies are not 'available.'" (quoting *Ross*, 578 U.S. at 643-44)); *see also Albino*, 747 F.3d at 1176 (concluding "as a matter of law that [the] defendants have failed to carry their initial burden of proving their affirmative defense that there was an available administrative remedy" (citing *Jones v. Bock*, 549 U.S. 199, 212 (2007))).

Accordingly, the Court recommends that the district judge deny Defendants' motion for summary judgment on the grounds that Russum failed to exhaust ODOC's grievance process.

### B.      Merits

Defendants also move for summary judgment on the merits of Russum's ADA and Rehabilitation Act claims. (*See* Defs.' Mot. at 15-17; Defs.' Reply at 3.) Specifically, Defendants claim that they "did not intentionally discriminate against [Russum] due to his mobility issues, and he was not excluded or deprived of time in the shower, access to the yard, law library, religious services, or the phone." (Defs.' Mot. at 17.) Russum responds that he "was denied the benefits of ODOC services—specifically, law library access, religious services, telephone access, canteen, and even basic hygiene—specifically *because* of his physical disabilities." (Pl.'s Resp. at 17.)

#### 1.      Applicable Law

"Title II of the ADA and [Section] 504 of the [Rehabilitation Act] both prohibit discrimination on the basis of disability." *Lovell*, 303 F.3d at 1052. "The ADA applies only to public entities, whereas the [Rehabilitation Act] proscribes discrimination in all federally-funded programs." *Id.*

---

complained 'directly to the staff' [but prison officials] never construed [the plaintiff's] complaints as requests for [grievance] forms").

PAGE 25 – FINDINGS AND RECOMMENDATION

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 provides, in relevant part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance[.]" 29 U.S.C. § 794. The term "disability" means "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]" 42 U.S.C. § 12102(1); *see also* 28 C.F.R. § 35.108(a)(2)(i) ("The definition of 'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."); 28 C.F.R. § 41.31(a) (listing a similar definition for the Rehabilitation Act). Under subsection (A) of 42 U.S.C. § 12102(1), "major life activities" include "but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" and "also includes the operation of a major bodily function[.]" 42 U.S.C. § 12102(2); *see also* 34 C.F.R. § 104.3(j)(2)(ii) (similar).

To establish a prima facie case under Title II, a plaintiff must show that "(1) [he] is a qualified individual with a disability; (2) [he] was excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of [his] disability." *Lovell*, 303 F.3d at 1052 (citing *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)). To establish a prima facie case under Section 504, a plaintiff must show that "(1) [he] is

PAGE 26 – FINDINGS AND RECOMMENDATION

handicapped within the meaning of the [Rehabilitation Act]; (2) [he] is otherwise qualified for the benefit or services sought; (3) [he] was denied the benefit or services solely by reason of [his] handicap; and (4) the program providing the benefit or services receives federal financial assistance." *Id.* (citing *Weinreich*, 114 F.3d at 978).

"A disability discrimination claim may be based on 'one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation.'" *Payan v. L.A. Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021) (citations omitted). "[A]lthough failure to make a reasonable accommodation and disparate impact are two different theories . . . , a public entity may be required to make reasonable modifications to its facially neutral policies which disparately impact people with disabilities." *Id.* (citing *Crowder v. Kitagawa*, 81 F.3d 1480, 1484-85 (9th Cir. 1996)). "The important difference between . . . [disparate impact and reasonable accommodation] theories is that a reasonable accommodation claim is focused on an accommodation based on an individualized request or need, while a reasonable modification in response to a disparate impact finding is focused on modifying a policy or practice to improve systemic accessibility." *Id.* (citations omitted); *cf. Crowder*, 81 F.3d at 1484 ("Rather than attempt to classify a type of discrimination as either 'deliberate' or 'disparate impact,' the Court determined it more useful to assess whether disabled persons were denied 'meaningful access' to state-provided services." (citing, *inter alia*, *Alexander v. Choate*, 469 U.S. 287, 302 (1985))).

Under both statutes, the "prohibition against discrimination 'is universally understood as a requirement to provide meaningful access.'" *Goodwin v. Marin Cnty. Tr. Dist.*, 675 F. Supp. 3d 1016, 1022 (N.D. Cal. Apr. 6, 2022) (simplified) (quoting *Lonberg v. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009)); *see also A.G. v. Paradise Valley Unified Sch. Dist. No. 69*, 815 F.3d 1195, 1204 (9th Cir. 2016) (applying the "meaningful access" analysis to suits under both Title II

PAGE 27 – FINDINGS AND RECOMMENDATION

and Section 504). Because Title II was modeled on Section 504, *see Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999), courts often analyze the two claims together and, "for purposes of this [opinion,] the elements of a valid Title II claim do not differ in any material sense from those of a valid section 504 claim and the two may be addressed together." *A.G.*, 815 F.3d at 1204.

### 2.    Analysis

Defendants move for summary judgment on the ground that the "State Defendants did not intentionally discriminate against [Russum] due to his mobility issue." (Defs.' Mot. at 17.) Specifically, Defendants argue that Russum "was not excluded or deprived of time in the shower, access to the yard, law library, religious services or the phone."[8] (*Id.* at 15-17.) Russum responds that he "was denied the benefits of ODOC services—specifically, law library access, religious services, telephone access, canteen, and even basic hygiene[.]" (Pl.'s Resp. at 16-23.)

"[T]he ADA entitles [AICs] to receive the benefits of the incarcerating institution's programs and services without facing discrimination on account of a disability." *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1068 (9th Cir. 2010) (simplified). The Supreme Court has held that these benefits include "recreational 'activities,' medical 'services,' and educational and vocational 'programs.'" *Yeskey*, 524 U.S. at 210 (simplified). The Ninth Circuit has held that the "denial of mobility-assistance devices to persons unable to physically function without them" violates Title II of the ADA where it interferes with the ability of AICs to "obtain basic services,

---

[8] Defendants do not dispute that Russum is an individual with a disability (*see* Russum Decl. ¶ 47, alleging that he "is physically impaired and [has] a degenerative hip condition which steadily worsened since 2019 without proper medical care, severely restricting Plaintiff's mobility"), nor that ODOC is a public entity that receives federal funding under the relevant definitions of the ADA and the Rehabilitation Act. *See Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (holding that "[s]tate prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government'" (quoting 42 U.S.C. § 12132)).

PAGE 28 – FINDINGS AND RECOMMENDATION

such as meals, mail, showers, and toilets." *Armstrong v. Brown*, 732 F.3d 955, 960 (9th Cir. 2013); *Bogovich v. Sandoval*, 189 F.3d 999, 1002 (9th Cir. 1999) (holding that the "denial of access to prison facilities, denial of satisfactory medical attention . . . or denial of the opportunity to participate in educational, vocational, or rehabilitation programs" are cognizable denials of benefits under Title II of the ADA); *see also Gardeley v. Dzurenda*, No. 3:24-cv-00111-MMD-CSD, 2024 WL 5457443, at *7 (D. Nev. Oct. 19, 2024) (holding that the plaintiff "state[d] a claim for violations of the ADA and [Rehabilitation Act] . . . [b]ased on the allegations . . . that he was denied the ability to communicate with his family because he did not have access to a [teletypewriter] phone"); *VanValkenburg v. Or. Dep't of Corr.*, No. 3:14-cv-00916-MO, 2017 WL 532950, at *3 (D. Or. Feb. 8, 2017) (holding that a "jury could find based on the evidence presented that ODOC discriminated against [the plaintiff] by not providing him with easier access to [a] videophone"); *Pierce v. County of Orange*, 526 F.3d 1190, 1196 (9th Cir. 2008) (holding that "physical barriers that deny disabled inmates access to certain prison facilities (bathrooms, showers, exercise and other common areas)" violate the ADA).

Russum alleges that while at OSP, he was unable to access the law library, religious services, showers, or the clothing line as a result of his mobility issues. (Russum Decl. ¶¶ 11-20.) As discussed, Defendants acknowledge that OSP "is not accessible to individuals in wheelchairs, walkers, or with mobility issues." (Lawson Decl. ¶ 2.) Although Lawson asserts "that OSP provides reasonable accommodation and modifications" (*id.*), Russum disputes whether OSP's accommodations were reasonable. For example, Russum asserts that he was unable to reach the clothing exchange, shower area, or the designated area to take legal calls, he was unaware of which materials to request from the law library without the ability to visit the law library, and he could not access religious services even informally. (Russum Decl. ¶¶ 11-17; *see also* Pl.'s Resp.

PAGE 29 – FINDINGS AND RECOMMENDATION

at 19, "Only a shred of common sense is required to deduce that perhaps a facility that is too old to be ADA-compliant and is largely inaccessible is not a reasonable housing location for someone with significant mobility issues.") Viewing these facts in the light most favorable to Russum, the Court concludes that factual disputes regarding OSP's accommodations preclude entry of summary judgment on Russum's ADA and Rehabilitation Act claims relating to his stay at OSP.

The Court reaches the same conclusion regarding Russum's ADA and Rehabilitation Act claims relating to his stay at OSCI. Russum alleges that after he transferred from OSP to OSCI, his "limited mobility prevented [him] from accessing the phones [in] the prison yard." (Russum Decl. ¶ 28.) Russum allegedly "made requests for accommodations on at least three occasions with regard to phone access, but these requests were never granted." (*Id*. ¶ 29.) In one of his kytes, Russum requested an accommodation to extend the ten-minute limitation on the indoor phones because he could not walk to the outdoor phones with no time limitation. (*Id.*) Russum also requested an accommodation for a shower stool because he was unable to stand in the shower but OSCI denied the request and did not provide alternative options. (*Id*. ¶ 25.)

Terry Shanley ("Shanley"), OSCI's ADA Compliance Manager, states that "[f]rom cell 2-11B, approximately [twenty-five] feet around the corner from the shower was an AIC accessible phone that was present during 2021 when AIC Russum was housed." (Terry Shanley Decl. ("Shanley Decl.") ¶ 6, Ex. 7, ECF No. 64.) Shanley alleges that "[a]nytime an AIC brings up a disability preventing access to a service/program such as recreation/phones or showers, the person in the ADA Coordinator position (my current role) would help navigate those challenges and ensure the AIC had access by working with medical and line staff." (*Id.* ¶ 3.) Defendants fail to address Russum's allegation that he was limited to ten minutes on in-unit phone calls and that

PAGE 30 – FINDINGS AND RECOMMENDATION

"phone calls on the yard did not have a time restriction for the two-hour duration of yard time, but on the yard, there were no places to sit during a call[.]" (Russum Decl. ¶ 29); *see also Holmes v. Godinez,* 311 F.R.D. 177, 203 (N.D. Ill. 2015) (denying summary judgment on an ADA claim where disabled plaintiffs alleged that phone "access [wa]s limited to shorter durations, fewer days of the week, and narrower times" than for non-disabled individuals). Defendants also fail to address why OSCI could not provide a shower stool for Russum.

In light of these conflicting accounts of Russum's ability to access services, there remains a genuine dispute of material fact as to whether Russum was denied meaningful access to services based upon his disability. Accordingly, the Court recommends that the district judge deny Defendants' motion for summary judgment on Russum's ADA and Rehabilitation Act claims.

## IV.    EIGHTH AMENDMENT

Defendants move for summary judgment on Russum's Eighth Amendment claims on the ground that the "State Defendants . . . actively responded [to] and provided adequate care for [Russum's] medical needs relating to his hip condition and . . . resulting pain." (Defs.' Mot. at 21.) Defendants also move for summary judgment on the grounds that Russum cannot establish individual involvement in the alleged constitutional violations or causation with respect to Superintendents Highberger or Miller, Dr. Roberts, Nurse Landaverde, or Bugher. (Defs.' Mot. at 23; Defs.' Reply at 5; Dr. Roberts' Mot. at 6-7; Bugher's Mot. at 5-6.)

Russum responds that Defendants "acted with deliberate indifference to [Russum's] serious medical injury and pain through (1) repeatedly refusing to provide proper and timely medical care for [Russum's] serious injuries, even when conservative measures did not provide relief; (2) knowingly providing medical care that fell below the community standard of care; and (3) ignoring [Russum's] repeated complaints of pain." (Pl.'s Resp. at 23-24.) Russum also

PAGE 31 – FINDINGS AND RECOMMENDATION

responds that Defendants in supervisory roles "had an affirmative duty to act once they became aware of Plaintiff's worsening condition and inadequate medical care, making them directly involved by failing to act after being put on notice." (Pl.'s Resp. at 32.)

### A.    Applicable Law

"A public official's 'deliberate indifference to a prisoner's serious illness or injury' violates the Eighth Amendment ban against cruel punishment." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). A plaintiff must establish that he was "confined under conditions posing a risk of 'objectively, sufficiently serious' harm and that the officials had a 'sufficiently culpable state of mind' in denying the proper medical care." *Id.* (citing *Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995)). "Thus, there is both an objective and a subjective component to an actionable Eighth Amendment violation." *Id.*

"To satisfy the objective prong, a plaintiff must 'show a serious medical need by demonstrating that failure to treat [the] prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.'" *Maney v. Brown*, 516 F. Supp. 3d 1161, 1178 (D. Or. 2021) (quoting *Hopton v. Fresno Cnty. Hum. Health Sys.*, No. 1:20-cv-00141, 2020 WL 1028365, at *5 (E.D. Cal. Mar. 3, 2020)).

"The subjective component requires [AICs] to show that the officials had the culpable mental state, which is deliberate indifference to a substantial risk of serious harm." *Clement*, 298 F.3d at 904 (simplified). "Deliberate indifference" is established only when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "A prison official's duty under the Eighth Amendment is to ensure 'reasonable safety'" and

PAGE 32 – FINDINGS AND RECOMMENDATION

"prison officials who act reasonably cannot be found liable[.]" *Farmer*, 511 U.S. at 844-45 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)). "Mere indifference, negligence, . . . medical malpractice[, or e]ven gross negligence is insufficient to establish deliberate indifference to serious medical needs." *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1082 (9th Cir. 2013) (simplified); *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016) ("A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." (quoting *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004))).

Deliberate indifference may be satisfied by showing: "(a) a purposeful act or failure to respond to a[n AIC]'s pain or possible medical need and (b) harm caused by the indifference."[9] *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citation omitted). "Indifference 'may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.'" *Id.* at 1096 (citation omitted). Yet, "an 'inadvertent [or negligent] failure to provide adequate medical care' alone does not state a claim under § 1983." *Id.* (citation omitted).

The Ninth Circuit has emphasized that "[d]eliberate indifference is a high legal standard." *Toguchi*, 391 F.3d at 1060. "[A] mere 'difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference'" and "[a] showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Id.* at 1058, 1060 (citations omitted). Rather, an AIC "must show that the chosen course of

---

[9] Defendants acknowledge that Russum's hip condition presented a "serious medical need[.]" (Defs.' Mot. at 18); *see also Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012) ("[T]he State concedes that [the plaintiff's] hip condition presents a serious medical need and meets the objective standard."), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014).

PAGE 33 – FINDINGS AND RECOMMENDATION

treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk to the [AIC]'s health.'" *Id.* at 1058 (simplified).

"A defendant may [also] be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). "The requisite causal connection can be established . . . by setting in motion a series of acts by others, or by knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* (simplified).

**B.    Analysis**

Defendants argue that Russum cannot show that they denied him the proper medical care with a sufficiently culpable state of mind. (Defs.' Mot. at 18-22.) Specifically, Defendants claim that their "[m]ere difference of medical opinion does not establish deliberate indifference." (*Id*. at 22.) Russum responds that "a jury could conclude Defendants knew of and disregarded an excessive risk to Plaintiff's health—by delaying specialist referrals, diagnostic imaging, and surgery despite long-standing knowledge that conservative care was failing; by deferring surgery without adequate alternatives; and by inadequately managing pain." (Pl.'s Resp. at 25.)

///

///

///

///

///

///

PAGE 34 – FINDINGS AND RECOMMENDATION

### 1.    Dr. Roberts[10]

Russum alleges that Dr. Roberts denied and delayed appropriate follow-up appointments with outside medical providers and proper medical care, including pain management. Specifically, Russum alleges that Dr. Roberts—as the head of the TLC Committee—disregarded Dr. Carpenter's recommendation that Russum receive arthroscopic femoroplasty. (*See* Seale Decl. Att. 1 at 55; *see also* FAC ¶ 68, "[a]t all material times, [Dr.] Roberts was head of the TLC Committee and tasked with final decision-making authority regarding [Russum]'s medical care, diagnostic testing and access to outside medical providers.")

After Dr. Carpenter recommended that Russum receive arthroscopic femoroplasty, Dr. Gulick presented the recommendation to the TLC Committee on June 9, 2020. (Seale Decl. Att. 1 at 55.) The TLC Committee, including Dr. Roberts, failed to approve femoroplasty at that time. (*Id.*; *see also id.* Att. 1 at 75, approving only a second opinion on December 8, 2020.) On June 30, 2022, "Dr. Foote, an orthopedic surgeon, . . . agreed that [Russum] would have been a good candidate for a femoroplasty back when it was first recommended, but that the delays in treatment caused too much damage and made him ineligible, so [Russum] would need a full hip replacement on both hips." (Russum Decl. ¶ 38; *see also* Baskerville Decl. ¶ 13, "Regrettably, needless delays . . . foreclosed [Russum's] [hip] surgical options.")

In *Snow*, the defendants "repeatedly deni[ed]" hip surgery "which had been recommended by specialists and by [the plaintiff's] treating physician." *Snow*, 681 F.3d at 986. The Ninth Circuit found that "the[se] circumstances . . . raise an inference that the defendants

---

[10] The Court reaches its conclusions herein without relying on the "Goldsmith Report," the December 17, 2024 report of Jill Goldsmith following her investigation of Dr. Roberts and Bugher in response to "significant concerns about patient care." (Greenfield Decl. Ex. 76.) Accordingly, the Court need not resolve Dr. Roberts' objections to Russum's reliance on the Goldsmith Report. (Dr. Roberts' Reply at 4-7; Russum's Sur-Reply at 2-9, ECF No. 95.)

PAGE 35 – FINDINGS AND RECOMMENDATION

were unreasonably relying on their own non-specialized conclusions with deliberate indifference to [the plaintiff's] medical needs." *Id.* Specifically, "[b]oth orthopedic surgeons hired by [the department of corrections] to consult on this case recommended [hip surgery], and did not recommend indefinite maintenance on NSAIDs, steroids, and narcotics as a solution." *Id.* at 987. Accordingly, the Ninth Circuit "conclude[d] that a reasonable jury could find that the defendants acted with deliberate indifference to [the plaintiff's] medical needs when they refused to authorize the recommended [hip] surgery." *Id.*; *see also Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012) (holding that a failure to approve hernia surgery after concluding that referral to surgery was necessary constituted "deliberate indifference in implementing the prescribed treatment").

Similarly here, a reasonable jury could find that Dr. Roberts, as the head of the TLC Committee, acted with deliberate indifference to Russum's serious medical needs by delaying and denying treatments recommended by Russum's outside medical providers. *See Fisher v. Cain*, No. 2:21-cv-00132-JR, 2022 WL 2307874, at *11 (D. Or. May 16, 2022) (denying summary judgment on a plaintiff's Eighth Amendment claim that a TLC Committee member delayed necessary treatment), *findings and recommendation adopted*, 2022 WL 2304490 (D. Or. June 27, 2022); *Romero v. Vargo*, No. 06:12-cv-01993-HU, 2014 WL 3746527, at *7 (D. Or. July 29, 2014) (denying summary judgment for TLC Committee members who delayed authorization of surgery).[11]

///

---

[11] Dr. Roberts' argument that his role as the leader of the TLC Committee does not establish personal participation when the TLC Committee voted to delay or deny recommended treatment is foreclosed by these decisions to the contrary. (*See* Dr. Roberts' Reply at 2-4, arguing that his role did not establish personal participation but citing no cases in support.)

PAGE 36 – FINDINGS AND RECOMMENDATION

For these reasons, the Court finds that there is a genuine dispute of material fact as to whether Dr. Roberts was deliberately indifferent to Russum's serious medical needs and recommends that the district judge deny Defendants' motion for summary judgment on Russum's Eighth Amendment claim against Dr. Roberts.[12] *See, e.g.*, *Egberto v. Nev. Dep't of Corr.*, 678 F. App'x 500, 505 (9th Cir. 2017) (holding that there was a genuine dispute whether a "delayed MRI" and "denials of spinal injections" constituted deliberate indifference to a serious medical need); *Wakefield v. Thompson*, 177 F.3d 1160, 1165 (9th Cir. 1999) (holding that summary judgment was inappropriate where "a prison official act[ed] with deliberate indifference [by] . . . ignor[ing] the instructions of the prisoner's treating physician or surgeon"); *see also Fisher*, 2022 WL 2307874 at *11 (denying motion for summary judgment on the plaintiff's Eighth Amendment claim for failure adequately to treat the plaintiff's shoulder injury).

### 2. Medical Providers

Russum alleges that Drs. Reese, Gulick, and Siegersma, Nurse Practitioners Maney and Balogun, and Nurses Lynch and Landaverde denied and delayed Russum appropriate follow-up

---

[12] Defendants argue that they are entitled to qualified immunity if the Court finds that they did not violate Russum's constitutional rights, but do not argue that the law governing Russum's claims was not clearly established. (State Defs.' Mot. at 24-25.) In light of the Court's finding that material disputed facts preclude entry of summary judgment on Russum's Eighth Amendment claims against all defendants except Superintendent Miller and Bugher, the Court finds that Defendants are not entitled to qualified immunity at the summary judgment stage. *See Miller v. Keast,* No. 3:23-cv-00371-MMD-CSD, 2026 WL 63346, at *3 (D. Nev. Jan. 7, 2026) (denying qualified immunity at the summary judgment stage where there was a genuine dispute of material fact as to whether the defendant "acted with deliberate indifference to [the plaintiff's] serious medical needs by delaying necessary medical care"). Dr. Roberts also argues that he is entitled to qualified immunity because "no precedent clearly establishes that a medical director, without direct patient care responsibilities, may be held personally liable for delays arising from institutional or logistical factors" (Dr. Roberts' Mot. at 6-7), but Dr. Roberts' involvement on the TLC Committee forms the basis of Russum's claims, not merely his role as ODOC's medical director.

PAGE 37 – FINDINGS AND RECOMMENDATION

with outside medical providers and proper medical care, including pain management. (FAC ¶ 106; *see also* Baskerville Decl. ¶ 32, noting that Russum's medical providers "repeatedly refused to prescribe gabapentin—a proven effective, standard of care medication for neuropathic pain"; *see also id.*, "By refusing to provide this essential medication, the ODOC providers subjected Mr. Russum to needless suffering and probable irreparable damage to his pain signaling pathways and interpretation within his central nervous system.")

Relying on the expert opinion of Dr. Manoso, Defendants argue that Russum received adequate medical care for his hip condition and resulting pain. (Defs.' Mot. at 18-22.) However, Defendants inexplicably ignore the expert opinion of Dr. Baskerville, who opined that "needless delays . . . foreclosed [Russum's hip] surgical options" and "Russum suffered needlessly from both nociceptive and neuropathic pain syndromes that remained inadequately treated by the ODOC medical providers during his incarceration." (Baskerville Decl. ¶ 27; *see also id.*, "His medical record was replete with his pleadings for more effective analgesics to provide better relief from disabling pain in his hips, back, neck, and arms.") Notably, Defendants' own medical expert did not offer an opinion on whether Defendants prescribed appropriate pain medications for Russum. (*See generally* Manoso Decl.)

Further, aside from Nurse Landaverde, Defendants do not argue that any of Russum's medical providers were not personally involved in Russum's allegedly deficient care. Defendants argue in their opening motion that Russum has not alleged Nurse Landaverde's personal participation, but did not respond to Russum's argument and record citation that Nurse Landaverde denied Russum effective pain relief. (*See* Pl.'s Resp. at 26-27, citing Exs. 10, 12, 21-22, 40-43, 58-60, 66-68, 71-74).

///

PAGE 38 – FINDINGS AND RECOMMENDATION

For these reasons, the Court concludes that a reasonable jury could find that Drs. Reese, Gulick, and Siegersma, Nurse Practitioners Maney and Balogun, and Nurses Lynch and Landaverde acted with deliberate indifference to Russum's serious medical needs and the district judge should deny their motions for summary judgment. *See R.M. v. Washington*, No. 318CV05387BHSTLF, 2022 WL 19331330, at *12 (W.D. Wash. Dec. 29, 2022) (denying treatment providers' motion for summary judgment on AIC's Eighth Amendment claims where "[t]he record [wa]s clear that [the] plaintiff's treating providers . . . had knowledge of [the] plaintiff's complaints of pain . . . [but the] record shows no evidence that either of them discussed or provided any treatment for [the] plaintiff's pain, as their records make no mention of it" which "raises an issue of fact as to whether these treating defendants were deliberately indifferent to [the] plaintiff's reports of pain"), *report and recommendation adopted*, 2023 WL 2711836 (W.D. Wash. Mar. 30, 2023); *Choquette v. Warner*, No. C15-5838 BHS-JRC, 2018 WL 834240, at *2 (W.D. Wash. Feb. 13, 2018) ("Plaintiff's claims still survive summary judgment as there is sufficient evidence to suggest that Defendants' denial of Plaintiff's multiple non-formulary requests goes beyond a disfavored medical option and instead consists of a deliberate or reckless disregard to Plaintiff's apparent neuropathic pain and need for adequate medication."); *Cardwell v. Kettelhake*, No. 2:08-CV-01006-JLR, 2012 WL 1130541, at *7 (E.D. Cal. Mar. 30, 2012) (denying the defendants' motion for summary judgment on AIC's Eighth Amendment claims because the defendants "failed to show that no issue of material fact exists as to whether they acted with deliberate indifference in response to [the plaintiff]'s request for Gabapentin" and rejecting the defendants' argument that "because they gave [the plaintiff] 800 milligrams of Motrin for pain, they did not act with deliberat[e] indifference").

///

PAGE 39 – FINDINGS AND RECOMMENDATION

### 3.    Superintendents

Russum names the superintendents of SRCI and OSCI as defendants. (*See* FAC ¶ 16, "Miller is and was at all relevant times Superintendent at SRCI."; *id.* ¶ 19, "Highberger is and was at all relevant times Superintendent at OSCI"). Defendants argue that Russum has not alleged any specific facts to demonstrate that Superintendents Miller or Highberger played an affirmative part in the alleged deprivation of Russum's constitutional rights. (Defs.' Mot. at 22-23.)

The Court recommends that the district judge grant Defendants' motion for summary judgment on Russum's claims against Superintendent Miller because Russum fails to present any evidence demonstrating that Superintendent Miller was involved in or aware of Russum's allegedly inadequate medical care. (*See* Pl.'s Resp. at 25, effectively conceding his claim against Superintendent Miller by addressing Defendants' argument regarding Superintendent Highberger's personal involvement but not citing any evidence of Superintendent Miller's personal involvement).

However, the district judge should deny Defendants' motion for summary judgment on Russum's claim against Superintendent Highberger. On June 22, 2021, Russum sent a kyte to Superintendent Highberger describing his hip condition, ongoing pain, and mobility issues, and stating he "hope[s] Highberger can help [and that he is] depressed and becoming hopeless[.]" (Russum Decl. ¶ 33; Greenfield Decl. Ex. 31.) Superintendent Highberger did not respond and Defendants do not point to any evidence in the record showing that Superintendent Highberger took any steps to address Russum's medical needs. (*See* Greenfield Decl. Exs. 31-32, reflecting that Superintendent Highberger referred Russum's kytes to ADA Coordinator Corrigan but not to any medical providers.) A reasonable jury could conclude that Superintendent Highberger's

PAGE 40 – FINDINGS AND RECOMMENDATION

conduct constituted deliberate indifference to Russum's serious medical needs.[13] *See Peralta,* 744 F.3d at 1086 (holding that "a prison administrator can be liable for deliberate indifference to a prisoner's medical needs if he 'knowingly fail[s] to respond to an inmate's requests for help'" (quoting *Jett,* 439 F.3d at 1098)); *see also Johnson v. Dzurenda,* No. 20-17280, 2021 WL 5755083, at *1 (9th Cir. Dec. 3, 2021) (holding that the district court properly denied summary judgment for prison administrator on the plaintiff's Eighth Amendment claim relating to the plaintiff's bunk assignment and rejecting the defendants' argument "that as high-level administrators they should not be held responsible for [a] bed assignment" because "a prison administrator can be liable for deliberate indifference to a prisoner's medical needs if he knowingly fails to respond to an inmate's requests for help" (quoting *Peralta,* 744 F.3d at 1085-86)); *cf. Ortiz v. Pierce County,* No. 3:22-cv-05947-JLR-TLF, 2023 WL 4405829, at *6 (W.D. Wash. May 16, 2023) (denying motion to dismiss the plaintiff's Eighth Amendment claim where the "plaintiff directly reached out to [the prison's chief of internal operations] asking her to help him access necessary medical care and address the concerns with his meals, but no action was taken" (citing *Jett,* 439 F.3d at 1098)), *report and recommendation adopted,* 2023 WL 3998464 (W.D. Wash. June 14, 2023).

For these reasons, the Court recommends that the district judge grant Defendants' motion for summary judgment on Russum's Eighth Amendment claim against Superintendent Miller but deny the motion with respect to Russum's Eighth Amendment claim against Superintendent Highberger.

---

[13] However, Russum has not presented any evidence that Superintendent Highberger had any responsibility for a transport officer's pushing of Russum during his transport from OSCI to SRCI and therefore the district judge should grant summary judgment for Highberger with respect to those allegations. (*See* FAC ¶ 55, "Upon information and belief, the transports were conducted in this manner upon the orders of Captain Hyde and Defendant Highberger.")

####    4.    Bugher

Russum alleges that Bugher "was at all relevant times the ODOC Health Services Director" (FAC ¶ 15) who "denied Plaintiff's grievances requesting medical care" and therefore "denied and delayed appropriate follow-up with outside medical providers and proper medical care, including pain management." (*Id.* ¶ 112.) Russum acknowledges that "mere administrative involvement in the grievance process is insufficient to create direct involvement for the purposes of deliberate indifference" but argues "that is not all that occurred here" because "Defendant Bugher was the highest level of grievance appeal[.]" (Pl.'s Resp. at 33; *see also id.*, further alleging that "Bugher [knew] that [Dr.] Roberts had implemented policies which were effectively delaying patient care").

The Ninth Circuit has clearly instructed that an Eighth Amendment violation "arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted). It is undisputed that Bugher did not personally participate in Russum's medical treatment. (*See* Pl.'s Resp. at 33, acknowledging that Bugher did not have "direct involvement for the purposes of deliberate indifference"). Courts have consistently held that Bugher's role denying grievance appeals as ODOC's Director of Health Services, without more, does not rise to the level of personal participation in an AIC's medical care to support an Eighth Amendment claim. *See, e.g.*, *Middleton v. Reyes*, No. 2:24-cv-00753-AN, 2025 WL 2782275, at *11 (D. Or. Sept. 29, 2025) ("Nothing in the record shows that Bugher personally participated in delaying or withholding medical care from plaintiff."); *Al-Khafagi v. Crites*, No. 3:19-cv-00669-AN, 2024 WL 4528984, at *10 (D. Or. Oct. 17, 2024) ("As for defendant Bugher, plaintiff argues that Bugher personally participated in plaintiff's care because he oversees all health care-related policy and procedures, all physicians and Nurse Practitioners, the health and well-being of AICs, and medical scheduling as Assistant Director of Health Services

PAGE 42 – FINDINGS AND RECOMMENDATION

of ODOC. However, the only evidence of Bugher's personal involvement is his denial of plaintiff's grievance appeals . . . , regarding plaintiff's care after decisions about that care had already been made. Without more, plaintiff does not show that defendant Bugher personally participated in plaintiff's care or that there was a causal connection between Bugher's conduct and the alleged inadequate or delayed medical care."), *reconsideration on other grounds granted in part*, 2025 WL 36275 (D. Or. Jan. 6, 2025); *Emery v. Or. Dep't of Corr.*, No. 2:19-cv-01070-MC, 2022 WL 503893, at *4 (D. Or. Feb. 18, 2022) ("Plaintiff has failed to provide sufficient evidence that Defendant[] Bugher . . . personally directed or knew of any constitutional violations carried out by [his] subordinates. Summary judgment is granted for Defendant[] Bugher . . . on these claims."); *cf. Munoz v. Oregon*, No. 6:22-cv-1348-SI, 2025 WL 3187572, at *6 (D. Or. Nov. 14, 2025) ("Thus, this well-plead allegation against Bugher—that Bugher knew about delays in medical care—does not establish that Bugher acquiesced in unconstitutional treatment.").

For these reasons, the Court recommends that the district judge grant Defendants' motion for summary judgment on Russum's Eighth Amendment claim against Bugher.[14]

## CONCLUSION

For the reasons stated, the Court recommends that the district judge GRANT IN PART and DENY IN PART Defendants' motion for summary judgment (ECF No. 87), DENY Dr. Roberts' motion for summary judgment (ECF No. 88), and GRANT Bugher's motion for summary judgment (ECF No. 89). If the district judge agrees, the following claims will proceed

---

[14] Russum never named or served the "John and Jane Does" included in his FAC. (*See* FAC ¶ 25, identifying "John and Jane Does" as individuals "who were at all times relevant ODOC employees assigned to work at TRCI, OSCI, OSP, or SRCI, who were personally involved in the violations alleged herein but whose identities are currently unknown"). Accordingly, the district judge should dismiss the Doe defendants.

PAGE 43 – FINDINGS AND RECOMMENDATION

to trial: Russum's ADA and Rehabilitation Act claims against ODOC and his Eighth Amendment claims against Drs. Roberts, Reese, Gulick, and Siegersma, Nurse Practitioners Maney and Balogun, Nurses Lynch and Landaverde, and Superintendent Highberger.

<strong>SCHEDULING ORDER</strong>

The Court will refer its Findings and Recommendation to a district judge. Objections, if any, are due within fourteen (14) days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen (14) days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

**IT IS SO ORDERED.**

DATED this 24th day of June 2026.

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

PAGE 44 – FINDINGS AND RECOMMENDATION